IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH DOWNS, et al.          :     CIVIL ACTION
                              :
          v.                  :
                              :
PETER J. ANDREWS, et al.      :     NO. 13-5788

MEMORANDUM

McLaughlin, J.                          December 18, 2014

          This lawsuit arises from a mortgage note sale that was

allegedly induced by fraud.  The plaintiffs, Joseph Downs,

Thomas Dunkel, USMR Fund 2, and Oakmont Note Group LLC

("Oakmont"), filed a two-count complaint against the two

individual defendants and two corporate defendants based on

their alleged participation in the fraudulent deal.  Count I is

for common law fraud, and Count II is for conspiracy and concert

of action in the commission of fraud.

          The defendants filed a motion to consolidate this case

with a previous case, Oakmont Note Group LLC v. Peter J.

Andrews, et al., 12-5257 ("Oakmont I").  The defendants also

moved to dismiss the complaint for lack of personal

jurisdiction, improper venue, failure to join a person under

Rule 19, and failure to state a claim upon which relief can be

granted.  Alternatively, the defendants moved to transfer the

case pursuant to 28 U.S.C. § 1404(a), but did not specify to

what court they would like the case transferred.  Finally, the
defendants moved for an award of attorneys' fees.  The Court
grants the motion in part and dismisses the complaint for
failure to state a claim.  The Court denies the motion to the
extent it seeks attorneys' fees.

I.   Factual and Procedural History[1]

Downs and Dunkel reside in Pennsylvania.  Together,
they own 100% of Oakmont, a limited liability company operating
out of King of Prussia, Pennsylvania.  Complaint ¶¶ 1-2, 4-5.

The defendant Peter Andrews is domiciled in New York,
and the defendant Gregory Palmer is domiciled in New Hampshire.
Together, Palmer and Andrews own defendant 2012-1 JV Holdings
LLC ("JV Holdings"), which operates out of New York.
Dreambuilder Investments LLC ("DBI") is owned by a series of
LLCs, each of which owned by Andrews and Rockingham Capital,

---

[1]    In considering the motion to dismiss for failure to state a
claim, the Court accepts as true all well-pleaded facts in the
complaint and draws all reasonable inferences in favor of the
non-moving parties, while disregarding any legal conclusions.
Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).

In responding to a motion to dismiss for lack of personal
jurisdiction under Fed. R. Civ. P. 12(b)(2), a plaintiff must
support its jurisdictional allegations with appropriate
affidavits or documents.  Time Share Vacation Club v. Atlantic
Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d Cir. 1984).  Any disputes
created by the affidavits, documents, or other record evidence
submitted for a court's consideration are resolved in favor of
the non-moving party.  Aircraft Guar. Corp. v. Strato-Lift,
Inc., 974 F.Supp. 468, 475 (E.D. Pa. 1997).

LLC.  Rockingham Capital, LLC is in turn owned by Palmer and his wife, who is also domiciled in New Hampshire.  Andrews Dep. 5:10-15; Palmer Dep. 10:22-11:3, 12:11-13:13.

Downs, Dunkel, Andrews, and Palmer work in the mortgage investment industry, in which they try to buy and sell mortgage notes for profit.  Over the years preceding the events in question, Downs and Dunkel bought numerous mortgage notes from Andrews and Palmer.  Complaint ¶¶ 17-20.

In March 2012, Andrews and Palmer contacted Downs and Dunkel with an offer to sell a package of 171 mortgage notes coded "NSP-0234 USMR" ("NSP-0234").  Andrews and Palmer offered NSP-0234 at a discount price of $740,707.47 if Downs and Dunkel wired the funds by March 30, 2012.  Andrews and Palmer told the plaintiffs that Andrews and Palmer needed the funds by March 30, 2012 to complete the purchase of a much larger portfolio of mortgage notes, of which NSP-0234 was a part.  Complaint ¶¶ 21-23, 25-26.

Downs and Dunkel wanted to purchase NSP-0234 due to its discount price, but did not have the funds needed available. They sought the money from Remar Investements LP ("Remar"). Remar is a limited partnership operating out of Nevada. Complaint ¶¶ 27-29.

Remar, Downs, and Dunkel entered into an oral agreement which called for:  (1) Remar to immediately advance

the $740,707.47 to the defendants in exchange for NSP-0234; (2) Downs and Dunkel to personally guarantee the $740,707.47 payment; (3) Remar to assign the rights to NSP-0234 to a newly created LLC, USMR Fund 2; (4) Remar to own 51% of USMR Fund 2; and (5) Oakmont to own 49% of USMR Fund 2 and handle the administration of the fund.  Complaint ¶ 30.

Pursuant to this oral agreement, Remar wired $740,707.47 to DBI on or before March 30, 2012.  Delivery of NSP-0234 was scheduled to be completed in two parts.  Group A, which consisted of 59 loans, was scheduled for delivery on or before June 15, 2012.  Group B, which consisted of 112 loans, was scheduled for delivery on or before June 20, 2012.  Complaint ¶¶ 31-33, 37-39.

On May 16, 2012, Remar assigned the 171 mortgage notes which constituted NSP-0234 to USMR Fund 2 (the "May 16, 2012 assignment").  Complaint ¶ 30; Pls.' Supplemental Ex. 1.

The complaint alleges that Andrews and Palmer lied when they told Downs and Dunkel that they would use the $740,707.47 to purchase NSP-0234.  They actually intended to use that money to fund a different transaction, and did in fact fund a different transaction with the money forwarded by Remar. Andrews and Palmer allegedly admitted that the funds were used to buy other mortgage notes which were delivered to other buyers.  Complaint ¶¶ 46, 51-52.

4

On June 15, 2012, Group A of NSP-0234 was delivered to USMR Fund 2.  35 of the 59 loans, however, were unenforceable due to a lack of necessary documentation or some other fundamental deficiency.  None of the notes contained in Group B were delivered by the June 20, 2012, due date.  On the date the complaint in this case was filed, October 2, 2013, only approximately $399,000 worth of enforceable notes had been delivered to USMR Fund 2.  Complaint ¶¶ 40-41, 43-44.

On September 13, 2012, Oakmont filed a complaint against Andrews, Palmer, DBI, and JV Holdings, alleging claims for common law fraud and conspiracy and concert of action in the commission of fraud.  Oakmont I.  On January 30, 2013, after the defendants filed a motion to dismiss arguing, in part, that the case should be dismissed due to Oakmont's failure to add Remar as a necessary party, Remar sold its interest in USMR Fund 2 to Oakmont (the "January 30, 2013 assignment").  Pls.' Supplemental Ex. 6.

In exchange for its membership interests in USMR Fund 2, Remar received a promissory note for $359,747.47.  This note was secured by:  (1) personal guarantees of both Downs and Dunkel; (2) security interests on all of Oakmont's assets; (3) a security interest in the membership interests of USMR Fund 2; and (4) a voting trust agreement in which Remar acts as the

trustee and can effectively vote for 100% of the USMR Fund 2 membership interests.  Pls.' Supplemental Exs. 2-11.

On August 15, 2013, the Court dismissed Oakmont I for lack of subject matter jurisdiction.  Oakmont I, ECF No. 62 (Aug. 14, 2013).  The Court held that the real party in interest was USMR Fund 2, which was owned by both Oakmont and Remar when the complaint in Oakmont I was filed.  Id. at 9-11.  The Court found that Oakmont had not sufficiently shown the citizenship of Remar, and had therefore not proven the citizenship of USMR Fund 2.  Id. at 12-14.  The Court dismissed the case because Oakmont had not shown that diversity jurisdiction existed.  Id. at 14-15.

On October 2, 2013, Downs, Dunkel, Oakmont, and USMR Fund 2 filed the complaint in this case.  The defendants filed the pending motion on January 2, 2014.

II.  Discussion

A.  Subject Matter Jurisdiction[2]

In order to establish diversity jurisdiction, the plaintiff must demonstrate that the parties are citizens of

---

[2]     The Court will address whether there is subject matter jurisdiction in this case despite the fact that the defendants did not move to dismiss on this basis.  See Liberty Mut. Ins. Co. v. Ward Trucking Corp., 48 F.3d 742, 750 (3d Cir. 1995) (citing the general rule that "federal courts have an ever-present obligation to satisfy themselves of their subject matter jurisdiction and to decide the issue sua sponte").

different states and the amount in controversy exceeds the sum of $75,000 exclusive of interests and costs.  28 U.S.C. § 1332(a).

For purposes of diversity jurisdiction, "[c]itizenship is synonymous with domicile and the domicile of an individual is his true, fixed and permanent home and place of habitation." McCann v. Newman Irrevolcable Trust, 458 F.3d 281, 286 (3d Cir. 2006).  Domicile is established by two elements:  a person's physical presence in a place and the intent to remain there indefinitely.  Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 48 (1989).  The citizenship of an LLC is determined by the citizenship of its members.  Zambelli Fireworks Mfg. Co., Inc. v. Wood, 592 F.3d 412, 420 (3d Cir. 2010).

Plaintiffs Joseph Downs and Thomas Dunkel are domiciled in Pennsylvania, and thus are citizens of Pennsylvania.  Downs and Dunkel are the only members of Oakmont, which as an LLC takes the citizenship of its members.  Oakmont is a citizen of Pennsylvania.  Complaint ¶¶ 1-2, 5.

When Remar sold its interest in USMR Fund 2 to Oakmont on January 30, 2013, Oakmont become the only member of USMR Fund 2.  At the time this action was filed, USMR Fund 2 was a citizen of Pennsylvania.  Pls.' Supplemental Ex. 6.

The defendants argue that the January 30, 2013 assignment was a sham transaction unsupported by consideration.

There is little support in the record for this argument.  Remar sold its membership interest in exchange for a promissory note for nearly $360,000.[3]  In addition, Oakmont granted Remar security interests in its USMR Fund 2 membership interests. Should Oakmont fail to pay off the promissory note, Remar could foreclose and retake its interests in USMR Fund 2.  There was adequate consideration for the January 30 assignment.  As of that date, Oakmont was USMR Fund 2's only member.  Pls.' Supplemental Exs. 2-11.

None of the defendants is a citizen of Pennsylvania. Andrews is domiciled in New York and is a citizen of that state. Palmer is domiciled in New Hampshire and is a citizen of that state.  Andrews and Palmer are the only members of JV Holdings, which is therefore a citizen of New York and New Hampshire. Andrews Dep. 5:10-15; Palmer Dep. 10:22-11:3, 13:9-10.

DBI is owned by a series of LLCs, each of which are owned by Andrews and Rockingham Capital, LLC.  Rockingham Capital, LLC is in turn owned by Palmer and his wife, who is also domiciled in New Hampshire.  DBI is a citizen of New York and New Hampshire.  Palmer Dep. 12:11-13:13.

---

[3]   At oral argument, counsel for the plaintiffs represented that the plaintiffs had paid off the promissory note to Remar in full as of August 2014.  The plaintiffs have not provided any evidence corroborating this representation, and the Court will operate as though the promissory note is still outstanding. Oral Arg. Tr. 12:16-13:9.

The plaintiffs are all citizens of Pennsylvania, and the defendants are citizens of New York and New Hampshire. There is complete diversity between the plaintiffs and defendants. The plaintiffs claim they are still owed hundreds of thousands of dollars' worth of mortgage notes. The amount in controversy easily exceeds the minimum of $75,000. Because there is complete diversity between the parties and the amount in controversy requirement is satisfied, the Court has subject matter jurisdiction under 28 U.S.C. § 1332.

### B.   Consolidation

The defendants' motion to consolidate this case with Oakmont I is denied because that case was dismissed and the time for appeal has run. Fed. R. Civ. P. 42(a) provides that "[i]f actions before the court involve a common question of law or fact, the court may . . . consolidate the actions."

Oakmont I is no longer before the Court; that case was dismissed and the time for appeal has run. The Court will not consolidate the current case with Oakmont I.

### C.   Personal Jurisdiction

The motion to dismiss for lack of personal jurisdiction is denied because the defendants have sufficient minimum contacts with Pennsylvania. Fed. R. Civ. P. 4(k)

authorizes district courts to exercise personal jurisdiction over nonresident defendants to the extent permissible under the law of the state in which the district court sits.  Fed. R. Civ. P. 4(k); O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 316 (3d Cir. 2007).  The Pennsylvania long-arm statute allows courts to exercise jurisdiction to the fullest extent permitted by the Constitution of the United States.  42 Pa. Const. Stat. § 5322(b); Vetrotex Certainteed Corp. v. Consol. Fiber Glass Prod. Co., 75 F.3d 147, 150 (3d Cir. 1996).

There are two types of personal jurisdiction:  general and specific jurisdiction.  O'Connor, 496 F.3d at 317.  DBI has conceded that the Court may exercise general jurisdiction over it.  The plaintiffs do not claim that the other three defendants are subject to general jurisdiction.  Rather, the plaintiffs claim that the other three defendants are subject to specific jurisdiction.

To satisfy the limitations of the Due Process Clause of the Fourteenth Amendment, the plaintiff must demonstrate that the defendant has constitutionally sufficient "minimum contacts" with the forum.  Vetrotex, 75 F.3d at 150.  The "minimum contacts" inquiry requires an examination of "the relationship among the forum, the defendant and the litigation."  Id. (quoting Shaffer v. Heitner, 433 U.S. 186, 204 (1977)).  There must be "some act by which the defendant purposefully avails

itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)).  Physical entrance to the forum is not required. O'Connor, 496 F.3d at 317 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985)).

If "minimum contacts" are shown, jurisdiction may be exercised where a court determines, in its discretion, that to do so would comport with "traditional notions of fair play and substantial justice." Vetrotex, 75 F.3d at 150-51 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

When a plaintiff brings a claim for an intentional tort, such as fraud, a court may exercise jurisdiction if the "effects test" announced in Calder v. Jones, 465 U.S. 783 (1984), is satisfied.  Imo Indus., Inc. v. Kiekert, AG, 155 F.3d 254, 259-60 (3d Cir. 1998).  Under the "effects test," a court may exercise personal jurisdiction over an intentional tort claim when:  (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) the defendant expressly aimed its tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity.  Id. at 265-66.

In order to make out the third prong of the test, a plaintiff must show that a "defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." Id. at 266.  An assertion "that the defendant knew that the plaintiff's principal place of business was located in the forum would be insufficient in itself to meet this requirement." Id. at 265.

If a plaintiff satisfies the three elements of the "effects test," a plaintiff "can demonstrate a court's jurisdiction over a defendant even when the defendant's 'contacts with the forum alone . . . are far too small to comport with the requirements of due process' under our traditional analysis." Marten v. Godwin, 499 F.3d 290, 297 (3d Cir. 2007) (quoting Imo Indus., 155 F.3d at 259)).

The first two prongs of the "effects test" are easily satisfied in this case.  The plaintiffs allege that the defendants committed fraud, an intentional tort.  The plaintiffs are all citizens of Pennsylvania and felt the brunt of the harm in Pennsylvania.

The third prong, although a closer question, is also satisfied in this case.  Andrews and Palmer, acting on behalf of JV Holdings, sent numerous emails to Downs and Dunkel both while

negotiating the contract and in trying to accommodate the plaintiffs once problems arose. Andrews Dep. 80:15-81:4, 142:10-16; Palmer Dep. 20:18-21:5, 89:14-20, 107:18-108:9, 122:20-123:4; Pls.' Opp. Ex. 4; Palmer Decl. Exs. A-E, G-H, Jan. 24, 2013.

Andrews and Palmer knew that Downs and Dunkel lived and worked in Pennsylvania when they negotiated the mortgage sale via email. Andrews Dep. 95:23-96:8, 98:1-11, 99:14-17; Palmer Dep. 86:14-18. By engaging in contract negotiations with Downs and Dunkel via email, Andrews and Palmer thus deliberately aimed their conduct at Pennsylvania. The third prong of the "effects test" is satisfied.

The defendants' contacts with Pennsylvania are sufficient even under the more stringent traditional "minimum contacts" analysis. In O'Connor, the Third Circuit held that a foreign hotel had sufficient contacts with Pennsylvania to satisfy the traditional "minimum contacts" test in a tort case. O'Connor, 496 F.3d at 323-24. The hotel's contacts with Pennsylvania consisted of mailing newsletters and a brochure to the plaintiffs in Pennsylvania, placing and receiving phone calls to the Pennsylvania plaintiffs, and entering into a contract to provide spa treatments to the plaintiffs. Id. at 315-16.

In this case, as in O'Connor, the defendants' contacts with Pennsylvania consist of remote communications and contract negotiations.  Although the form of remote communication differs, the substance is the same: both the defendant in O'Connor and the defendants in this case remotely directed communications into Pennsylvania to enter into a contractual relationship with Pennsylvania residents.  See also Grand Entm't Grp., Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 482–83 (3d Cir. 1993).

Exercising jurisdiction in this case would also comport with "traditional notions of fair play and substantial justice."  Int'l Shoe, 326 U.S. at 316.  The existence of "minimum contacts" "makes jurisdiction presumptively constitutional, and the defendant 'must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'"  O'Connor, 496 F.3d at 324.  The primary concern in any case is the burden on the defendant.  Id.

The defendants have not made any case, much less a compelling one, that exercising jurisdiction in this case would be unreasonable.  They have not made any arguments that litigating this case in Pennsylvania would place an undue burden on them.  Exercising jurisdiction comports with traditional notions of fair play and substantial justice.

D.   <u>Venue</u>

Venue is proper in this district because the plaintiffs engaged in their end of the contract negotiations in this district.  The relevant venue statute, 28 U.S.C. § 1391(b)(2), provides that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  This requirement is "intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute."  <u>Cottman Transmission Sys., Inc.</u> <u>v. Martino</u>, 36 F.3d 291, 294 (3d Cir. 1994).

The focus of the § 1391(b)(2) inquiry is not a defendant's contacts with a particular district, but rather "the location of those 'events or omissions giving rise to the claim.'"  <u>Id.</u>  In assessing whether events or omissions giving rise to the claims are substantial, "it is necessary to look at the nature of the dispute." <u>Id.</u> at 295.  The statute does not require a court to select the "best" forum.  <u>Id.</u> at 294.

In this case, the events giving rise to the plaintiffs' claims are the contract negotiations underlying the sale of NSP-0234.  It was during these negotiations that the defendants allegedly fraudulently misrepresented their intention of buying a package of mortgages using the funds advanced by Remar on behalf of the plaintiffs.

15

These contract negotiations took place remotely, with the defendants operating out of New York and New Hampshire and the plaintiffs operating out of King of Prussia, Pennsylvania, in the Eastern District of Pennsylvania.  Although the alleged misconduct did not take place in this district, a substantial portion of the underlying contract negotiations did.  See Lannett Co., Inc. v. Asherman, 2014 WL 716699 at *4 (E.D. Pa. Feb. 24, 2014) (holding that the fact that the alleged misconduct took place in Wyoming did "not establish that venue is improper in the Eastern District of Pennsylvania").

It would not be accurate to describe the Eastern District of Pennsylvania as a "remote district having no real relationship to the dispute."  A substantial part of the events giving rise to the plaintiffs' claims took place in this district; venue is proper under 28 U.S.C. § 1391(b)(2).


E.   Failure to Join under Rule 19

The defendants argue that Remar is a person required to be joined under Fed. R. Civ. P. 19, and that if Remar's joinder is not feasible the action should be dismissed under Rule 19(b).  A court should analyze a motion to dismiss for failure to join a person under Rule 19 in two steps.  First, a court should determine if the person is required to be joined if feasible under Rule 19(a)(1).  Gen. Refractories Co. v. First

State Ins. Co., 500 F.3d 306, 312 (3d Cir. 2007).  If a person is required to be joined under Rule 19(a)(1) but the absent person's joinder would destroy a court's jurisdiction, a court must determine whether the action should proceed among the existing parties or should be dismissed under Rule 19(b).  Id. The inquiry under Rule 19(a)(1) is broken down into two further prongs.  If either subsection is satisfied, the absent person or entity is required to be joined if feasible.  Id.

     1.   Rule 19(a)(1)(A)

Under Rule 19(a)(1)(A), a person is required to be joined, if, in that person's absence, a court cannot accord complete relief among existing parties.  This inquiry is limited to whether a court can grant complete relief to persons already named as parties in the action; any effect a decision may have on an absent person is immaterial.  Gen. Refractories Co., 500 F.3d at 313.

In this case, the Court would be able to accord complete relief to the plaintiffs even without joining Remar. If the Court or a jury granted judgment for the plaintiffs, an award of damages would be sufficient to make the plaintiffs whole.  There is no need to join Remar to grant complete relief to the plaintiffs.

Similarly, the Court could accord complete relief to the defendants – if the defendants prevail in this suit, the plaintiffs' requests for relief would be denied in their entirety.  Remar is not required to be joined under Rule 19(a)(1)(A).

2.    Rule 19(a)(1)(B)

Under Rule 19(a)(1)(B), a person must be joined if they claim an interest relating to the subject of the action and proceeding without the person would:  (1) impair or impede the person's ability to protect the interest; or (2) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations.

It is unclear whether Remar has an interest in the subject of this action.  Remar is a party to the contract underlying the plaintiffs' claims, and was thus the original purchaser of the mortgages contained in NSP-0234.  The May 16, 2012 assignment states that

> Remar Investments LP . . . does by these presents hereby convey, grant, bargain, sell, assign, transfer, set over and deliver unto, USMR Fund 2 LLC . . . the 171 promissory notes listed in Exhibit A from that certain Mortgage Loan Sale Agreement between 2012-1 JV Holdings, LLC as Seller and Remar Investments LP as Buyer dated March 29, 2012 (the "Notes"), together with all rights therein and thereto and any and all interest due thereon.

18

Pls.' Supplemental Ex. 1.

The plaintiffs argue that the May 16, 2012 assignment, coupled with the January 30, 2013 assignment, extinguished all of Remar's rights and interests in the underlying contract. Pls.' Opp. 16-17.  It is not clear, however, that Remar actually assigned all of its rights and interests in the subject of this action to USMR Fund 2 and Oakmont.

The May 16, 2012 assignment states that Remar assigned the 171 promissory notes which were the subject of the contract between Remar and JV Holdings, as well as "all rights therein and thereto," to USMR Fund 2.  The May 16, 2012 assignment makes no mention of an assignment of Remar's rights under the contract itself, or of an assignment of any fraud claim that Remar might have against the defendants.  Remar may have retained an interest in the underlying transaction despite the May 16, 2012 assignment.

The plaintiffs also argue that Remar has not suffered any damages because the plaintiffs indemnified Remar from all harm stemming from Remar's payment of $740,707.47 to the defendants in March 2012.  Pls.' Opp. 16-17.  The plaintiffs have not produced any evidence of the alleged indemnification; nor have they produced any evidence that the plaintiffs would indeed be able to indemnify Remar for any losses Remar suffered

from the mortgage note transaction.  The extent of Remar's
damages stemming from this transaction is unknown to the Court
at this point.

It may be that proceeding in this action without Remar
would subject some of the existing parties to double, multiple,
or inconsistent obligations.  If Remar has sustained damages and
retained an interest in this transaction, it could file suit
against the defendants.  This, coupled with a possible favorable
judgment for the plaintiffs in this action, could subject the
defendants to double or inconsistent obligations.

Additionally, assuming Remar is a person required to
be joined, it is not clear whether joinder of Remar is feasible.
Despite over two years of litigation between this action and
Oakmont I, the plaintiffs have not established the citizenship
of Remar, their partner in the underlying mortgage transaction.
See, Oakmont I, ECF No. 62 at 12-14.  The Court is concerned
with the plaintiffs' repeated failures, despite numerous
opportunities, to provide information about the citizenship and
identity of Remar and to clarify Remar's relationship to this
litigation.  As the Court explained at oral argument, Remar is
the plaintiffs' contact, and the responsibility for the
continued lack of clarity regarding Remar's relationship to this
litigation ultimately lies with the plaintiffs.  Oral Arg. Tr.
6:18-7:18.

The Court cannot see how it can allow the case to go forward without Remar; the risk of prejudice to the defendants is too great.  Fed. R. Civ. P. 19(b)(1).  This risk is underscored by the fact that Remar refused to grant the defendants a full release from liability, indicating that Remar may indeed institute some action against the defendants in the future.  Oral Arg. Tr. 8:6-17.  The plaintiffs have failed to articulate how the risk of prejudice could be lessened or avoided by any measures.  Fed. R. Civ. P. 19(b)(2).  Additionally, the plaintiffs could still file a breach of contract action should the case be dismissed.  Fed. R. Civ. P. 19(b)(4).  The risk of prejudice to the defendants, coupled with the plaintiffs' failure to state a claim, mandates dismissal of the plaintiffs' complaint.

F.    Failure to State a Claim[4]

The defendants argue that the plaintiffs' fraud claim should be dismissed for several reasons:  the plaintiffs'

---

[4]    The parties disagree as to which state's law should apply, but do not make any choice of law arguments in their briefs. The defendants cite to Pennsylvania law in their motion, while the plaintiffs cite to both Pennsylvania and New York law in theirs.  The parties agree that the underlying contract in this case calls for New York law to govern.  The Court does not decide the conflict of law question, as the outcome is the same under the substantive law of either jurisdiction.  On Air Entm't Corp. v. Nat'l Indem. Co., 210 F.3d 146, 149 (3d Cir. 2000).

allegations do not meet the elements of fraud; the plaintiffs'
fraud claim is barred by the parole evidence rule; and the
plaintiffs' fraud claim is barred by the gist of the action
doctrine.  Because the Court finds that the plaintiffs' fraud
claim is barred by the gist of the action doctrine, the Court
will not consider the defendants' other two arguments.[5]

Both Pennsylvania and New York courts apply the gist
of the action doctrine to determine whether a tort claim is
barred because the action truly sounds in contract.  <u>Bohler-
Uddeholm America, Inc. v. Ellwood Group, Inc.</u>, 247 F.3d 79, 103
(3d Cir. 2001); <u>Wall v. CSX Transp., Inc.</u>, 471 F.3d 410, 416 (2d
Cir. 2006).

Under Pennsylvania law, this doctrine forecloses tort
claims related to contractual relationships unless the gist of
the action is truly tort, "with the contract being collateral."
<u>Bohler-Uddeholm</u>, 247 F.3d at 103.  A claim should be "limited to
a contract claim when 'the parties' obligations are defined by
the terms of the contracts, and not by the larger social

---

[5]   The plaintiffs bring two claims against the defendants in
the complaint:  Count I – Common Law Fraud; and Count II –
Conspiracy and Concert of Action in the Commission of Fraud.  In
their motion to dismiss, the defendants address only the fraud
claim and do not discuss the conspiracy claim at all.

To recover for civil conspiracy, a plaintiff must prove a
separate underlying tort.  <u>Boyanowski v. Capital Area
Intermediate Unit</u>, 215 F.3d 396, 405-07 (3d Cir. 2000).  Because
the fraud claim is dismissed, the civil conspiracy claim must
also be dismissed as there is no underlying tort supporting it.

policies embodied in the law of torts.'"  Id. at 104 (quoting
Bash v. Bell Telephone Co., 601 A.2d 825, 830 (Pa. Super. Ct.
1992)).

Whether the doctrine acts to bar a fraud claim turns
"on the question of whether the fraud concerned the performance
of contractual duties."  eToll, Inc. v. Elias/Savion Adver.,
Inc., 811 A.2d 10, 19 (Pa. Super. Ct. 2002).  Under the gist of
the action doctrine, courts have barred fraud claims:  (1) which
arise solely from a contract between the parties; (2) where the
duties allegedly breached were created and grounded in the
contract itself; (3) where the liability stems from a contract;
or (4) where the tort claim essentially duplicates a breach of
contract claim.  Id. (collecting cases).

Similarly, under New York law, "a fraud claim may not
be used as a means of restating what is, in substance, a claim
for breach of contract," and "general allegations that defendant
entered into a contract while lacking the intent to perform it
are insufficient to support a fraud claim."  Wall, 471 F.3d at
416 (quoting New York Univ. v. Cont'l Ins. Co., 662 N.E.2d 763,
769 (N.Y. 1995)).  New York law does, however, recognize a cause
of action for fraud in the inducement when the misrepresentation
is collateral to the contract it induced.  Id.

The plaintiffs allege that the defendants fraudulently
represented that they would use the money advanced by Remar to

purchase the mortgages contained in NSP-0234.  The plaintiffs
further allege that the defendants never intended to use that
money to purchase NSP-0234, but rather intended and indeed did
use the money to purchase other mortgages which the defendants
transferred to third parties.  Complaint ¶¶ 50-53.[6]

      The heart of the plaintiffs' fraud claim, however, is
that the defendants did not deliver the enforceable mortgage
notes that the plaintiffs were due under the contract and the
subsequent May 16, 2012 assignment.  The contract is hardly
collateral to this claim; it created the defendants' duty to
deliver the mortgage notes.  The core of the plaintiffs' claim
is that the defendants violated an obligation created by
contract, rather than by "the larger societal policies embodied
in the law of torts."  <u>Bohler-Uddeholm</u>, 247 F.3d at 104.  The
gist of this action is contractual, not tortious; the
plaintiffs' fraud claim is therefore barred by the gist of the

---

[6]    Plaintiff's counsel argued at oral argument that the
"fundamental claim is, they sold something they didn't have
rights to," and "it was all a fraud that they ever had the
rights to" the mortgage notes.  Oral Arg. Tr. 41:7-12.  This
theory of fraud is diametrically opposed to the theory of fraud
advanced in the complaint, which stated that "Andrews and Palmer
falsely induced Downs and Dunkel to advance $740,000 based on
false statements that <u>the advance would be used to purchase</u> a
discreet group of enforceable loans known as NSP-0234."
Complaint ¶ 50 (emphasis added).  The inability of the
plaintiffs to articulate a consistent theory of fraud further
convinces the Court that the gist of this action sounds in
contract rather than in fraud.

action doctrine.  See Wall, 471 F.3d at 416-17; eToll, 811 A.2d at 19.  The plaintiffs' complaint is dismissed.[7]


     G.   Attorneys' Fees

     The defendants argue that they are due attorneys' fees under the terms of the mortgage sale contract entered into by Remar and JV Holdings.  They have not, however, cited any law supporting the position that the clause providing for attorneys' fees is enforceable under any state's law.  More importantly, it is unclear whether Remar has assigned its rights under the contract to USMR Fund 2, much less whether Remar has transferred its duties under the contract.  The defendants have not shown that the plaintiffs are bound by the attorneys' fees clause of the mortgage sale contract.  Their motion for attorneys' fees is denied.


     An appropriate order shall issue.

---

[7]    The Court notes that the plaintiffs were free to file a breach of contract claim but have declined to do so.